UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
TRUSTEES OF THE NEW YORK CITY                              :
DISTRICT COUNCIL OF CARPENTERS                             :
PENSION FUND, WELFARE FUND,                                :
ANNUITY FUND, and APPRENTICESHIP,                          :     17-CV-6485 (VSB)
JOURNEYMAN RETRAINING,                                     :
EDUCATIONAL AND INDUSTRY FUND,                             :     **OPINION & ORDER**
TRUSTEES OF THE NEW YORK CITY                              :
CARPENTERS RELIEF AND CHARITY                              :
FUND, THE NEW YORK CITY AND                                :
VICINITY CARPENTERS LABOR-                                 :
MANAGEMENT CORPORATION, and the                            :
NEW YORK CITY DISTRICT COUNCIL OF                          :
CARPENTERS,                                                :
                                                           :
                               Petitioners,                :
                                                           :
            - against -                                    :
                                                           :
                                                           :
CAROLINA TRIM LLC,                                         :
                                                           :
                               Respondent.                 :
                                                           :
-----------------------------------------------------------X

Appearances:

Marlie P. Blasie
Nicole Marimon
Todd Dickerson
Julie Anne Dabrowski
Virginia & Ambinder, LLP
New York, NY
*Counsel for Petitioners*

Brian Lee Greben
Greben Law
New York, NY
*Counsel for Respondent*

VERNON S. BRODERICK, United States District Judge:

Before me is Petitioners' petition to confirm and enforce an arbitrator's award under section 301 of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185. For the reasons that follow, the petition is DENIED, and this case is remanded to the arbitrator for reconsideration.

I. **Factual Background and Procedural History**[1]

A. *The Parties and Their Collective Bargaining Agreement*

Petitioners include the New York City District Council of Carpenters (the "Union") and several associated benefit funds (the "Funds," and together with the Union, "Petitioners"). The Union "is a labor organization that represents employees in an industry affecting commerce within the meaning of section 501 of the LMRA, 29 U.S.C. § 142, and is the certified bargaining representative for certain employees of the Respondent." (Pet. ¶ 7.)[2] The Funds consist of retirement and charity funds organized under the Employee Retirement Income Security Act of 1974 ("ERISA"), the Internal Revenue Code, and New York law, respectively. (*Id.* at ¶¶ 4–6.) Respondent Carolina Trim, LLC ("Respondent") was a North Carolina Limited Liability Corporation that specialized in interior and ceramic tile contracting. (Lautner Decl. I ¶ 1.)[3]

---

[1] The facts set forth in this section are derived from the following: (i) Petitioners' Petition to Confirm an Arbitration Award and its accompanying exhibits, (Doc. 1); (ii) Respondent's Answer and Affirmative Defenses to the Petition, (Doc. 18); (iii) Respondent's Memorandum of Law in Opposition to Petition to Confirm Arbitration Award, (Doc. 20), and its accompanying declarations and exhibits, (Docs. 21, 22); (iv) Petitioners' Reply Memorandum of Law in Further Support of Petition to Confirm an Arbitration Award, (Doc. 28), and its accompanying declaration and exhibits, (Doc. 27); (v) Respondent's Sur-Reply Memorandum of Law in Opposition to Petition to Confirm Arbitration Award, (Doc. 30), and its accompanying declarations and exhibit, (Docs. 29, 31); (vi) the parties' October 4, 2019 joint letter and accompanying exhibit, (Doc. 37); and (vii) the parties' representations at the November 7, 2019 status conference, ("Nov. 22, 2019 Tr."). My presentation of the facts in this opinion is not a finding as to their veracity, and I make no such finding.

[2] "Pet." refers to the Petition to Confirm an Arbitration Award, filed on August 25, 2017. (Doc. 1).

[3] "Lautner Decl. I" refers to the Declaration of Mark Lautner, filed on April 27, 2018, (Doc. 21), in support of Respondent's Memorandum of Law in Opposition to Petition to Confirm Arbitration Award, (Doc. 20). Mark Lautner was the managing member and principal of Respondent.

During the relevant times, Respondent was an employer within the meaning of section 3(5) of ERISA, 29 U.S.C. § 1002(5). (Pet. ¶ 8.)

Respondent signed an Independent Building Construction Agreement (the "CBA") with the Union covering a period from July 1, 2001 through July 20, 2006, and in 2011 signed an Interim Compliance Agreement extending its CBA obligations.[4] (Pet. ¶¶ 9–10; Pet. Exs. A, B; Lautner Decl. I ¶ 2.) Under the CBA, Respondent was required to remit contributions to the Funds when it performed work within the Union's scope and jurisdiction. (Pet. Ex. A Art. XV § 1.) The CBA further required that Respondent submit to audits by the Funds to determine whether Respondent remitted the necessary contributions to the Funds. (*Id.*) The CBA provided that Respondent was bound to the Funds' Collection Policy. (*Id.* at Art. XVI § 2; *see also* Pet. Ex. C.) The Collection Policy provided that if an employer refuses to submit to an audit, "the Fund Office shall determine the estimated amount of the employer's delinquent contributions based on the assumption that the employer's weekly hours subject to contributions for each week of the requested audit period are the highest number of average hours reported per week for any period of four consecutive weeks during the audit period." (Pet. Ex. C § IV(12).) The Collection Policy further provided that "[u]pon making such a determination, the Fund Office or Collection Counsel shall send . . . a Notice of Intent to Arbitrate . . . against the employer," where "the employer will be responsible for all delinquent contributions in the estimated amount determined under this paragraph, and all other amounts set forth in [the policy]." (*Id.*)

---

[4] The Interim Compliance Agreement states that the parties agreed to extend the CBA "until Union negotiates the successor Agreement . . . ." (Pet. Ex. B Art. I.) However, neither party has submitted evidence as to whether a successor Agreement was negotiated. Thus, I have no basis to determine whether the arbitrator properly construed the parties' CBA as applying to the total audit period in question, May 11, 2011 to June 21, 2016.

### B. *Petitioners' Audit Requests and the Subsequent Arbitration*

Respondent claims that from May 2011 through 2016, it received occasional correspondence from Petitioners regarding audit requests related to work performed by Respondent and the Union. (Lautner Decl. I ¶¶ 3–5.) Respondent claims that it responded to each request with telephone calls, but did not hear back from Petitioners until they commenced arbitration. (*Id.*) Petitioners claim that Respondent refused to submit to an audit of its books and records, (Pet. ¶ 16), a claim credited by the arbitrator during arbitration, (Award, at 1).[5] Due to Respondent's failure to furnish records in response to the audit request, Christopher Ozard conducted an estimated audit on behalf of the Funds pursuant to the terms of the CBA and Collection Policy. (Ozard Decl. Ex. B.)[6] First, Ozard "ascertained that the highest average of four weeks' reporting from May 11, 2011 through [June 19, 2016] . . . occurred between the week ending September 21, 2013 and week ending August 11, 2013." (Ozard Decl. ¶¶ 3–7.) Ozard found that Respondent's "average remittances during this four-week period amounted to $6,574.73." (*Id.* ¶ 7.) Ozard next applied this average to "each week [May 11, 2011 through June 19, 2016] to estimate [Respondent's] unpaid contributions during the audit period." (*Id.* ¶ 8.) The estimated principal deficiency totaled $1,735,020.65.

On June 21, 2016, Petitioners sent Respondent a Notice of Intention to Arbitrate. (Greben Decl. I Ex. A, at 3–4.)[7] The Notice listed a delinquency period from "May 11, 2011 to date." (*Id.*) On July 5, 2016, the arbitrator mailed a Notice of Hearing to the parties, scheduling the arbitration in this case for September 22, 2016 and describing the "issue" for arbitration to be

---

[5] "Award" refers to the October 27, 2016 Opinion and Default Award of arbitrator. (Pet. Ex. E.)

[6] "Ozard Decl." refers to the Declaration of Christopher Ozard in Further Support of Petition to Confirm Arbitration Award, filed on May 18, 2018. (Doc. 27.)

[7] "Greben Decl. I" refers to the Declaration of Brian L. Greben, filed on April 27, 2018, (Doc. 22), in support of Respondent's Memorandum of Law in Opposition to Petition to Confirm Arbitration Award, (Doc. 20).

4

Respondent's estimated $1,735,020.65 contribution deficiency. (Pet. Ex. D.) On July 10, 2016, Respondent contacted Petitioners to explain that he only performed two jobs with Petitioners in 2011 and 2013,[8] and stated that the estimated deficiency described in the Notice of Hearing "[was] completely ridiculous." (Greben Decl. I Ex. A, at 2.). Respondent further explained that he changed payroll companies since the time period in question, making it hard to obtain the records required for the arbitration. (*Id.*) In early September, Respondent also contacted the arbitrator to request an adjournment of the arbitration hearing so that he could gather the appropriate records. (*Id.* at 1; Award, at 1; Ozard Decl. Ex. B.) Respondent again stated that he "did only 2 projects in the jurisdiction of [Petitioners]." (Greben Decl. I Ex. A, at 1.) The arbitrator granted Respondent's September 5, 2016 request for an adjournment of the September 22, 2016 hearing, "with the understanding that [Respondent] would have until [October 25, 2016] to provide the required Company records, so as [] to allow [Petitioners] to complete [their] audit." (Award, at 1–2; *see also* Ozard Decl. Ex. B.) Respondent was also notified that its failure to comply with the conditions of adjournment would result in the arbitrator issuing an award for the entire amount included in Petitioners' estimated audit. (*Id.* at 2.) Respondent failed to furnish the necessary records or appear at the October 25, 2016 arbitration hearing. Thus, the arbitrator "found the Respondent to be in default and proceeded to hear the testimony and take evidence on the clams of the Petitioners." (*Id.*)

On October 27, 2016, the arbitrator entered an Opinion and Default Award in favor of Petitioners ("Award"). (*Id.*) The Award states that "[t]he uncontroverted testimony and evidence established that the Respondent was bound to a Collective Bargaining Agreement with

---

[8] This assertion is contradicted by the estimated audit, which contains billing amounts from twelve weeks in 2014, Ozard Decl., Ex. A), and paystubs demonstrating that Respondent worked with the Union in 2014, (*Id.* Exs. D, E). Respondent admitted in the instant proceeding that he forgot about his 2014 work with the Union as the job in question was short and he was not personally involved. (Lautner Decl. I ¶ 12.)

5

the New York City District Council of Carpenters and said Agreement became effective [May 11, 2011]." (*Id.*) The Award further states that the "Contract obligated the Respondent Employer to make its Books & Records . . . available for examination by [Petitioners'] auditors in order to verify that all required contributions were made to each of the [funds] maintained by the Petitioners." (*Id.*) Having found that Respondents failed to comply with this obligation, the arbitrator received into evidence the "summary report" of the estimated audit, which portrayed Respondent's deficiency to be $1,735,020.65. (*Id.*) Relying on this evidence, the arbitrator awarded Petitioners $1,735,020.65, plus interest, liquidated damages, cost of the suit, attorney fees, and the fee of the arbitrator, for a total award of $2,345,212.55. (*Id.* at 3.)

    **C.** *The Tolling Agreement, Revised Audit, and Filings Related to the Petition*

In the wake of the Award, the parties entered into a Tolling Agreement in order to provide Respondent the opportunity to furnish records so that Petitioners could conduct a revised audit. (Pet. Ex. F.) The parties agreed to toll "any and all statute of limitations periods pertaining to the Funds' rights to confirm the Arbitration Award . . . through the date of the completion of the new audit." (*Id.* ¶ 5.) The agreement also provided that "[u]pon completion of the new audit to the Funds' satisfaction, the Funds shall agree to vacate the Arbitration Award and pursue their rights concerning those unpaid contributions found to be due and owing by the new audit." (*Id.* ¶ 7.) Respondent claims that "[a]fter the tolling agreement, [he] expected to hear from the auditors regarding what they needed for the audit. However . . . the auditors failed to contact [him]." (Lautner Decl. I ¶ 9.) Then, on August 25, 2017, Petitioners filed the Petition seeking confirmation of the Award and entry of judgment. (Doc. 1.) On the same day, Petitioners filed a memorandum of law in support of the Petition. (Doc. 4.)

On November 1, 2017, the parties submitted a letter motion for an extension of time for

Respondent to answer the Petition. (Doc. 11.) The letter stated that "[Respondent] has agreed to allow [Petitioners] to conduct an audit of its books and records for the purpose of determining the amount of any delinquencies owed to [Petitioners]." The letter further stated that [Petitioners] are in the process of gathering the documents necessary to complete this audit and anticipate reaching a resolution of the matter upon its completion." (Doc. 11.) I granted the parties' request and extended Respondent's time to respond to December 29, 2017. (Doc. 12.) On December 18, 2017, the parties submitted a second letter motion for an extension of time for Respondent to answer the Petition. (Doc. 13.) The letter stated that "[Petitioners] are in the process of conducting an audit of [Respondent's] books and records for the purpose of determining the amount of any delinquencies owed to [Petitioners]," and that the "audit has taken [Petitioners'] auditors longer than expected in light of delays in obtaining necessary documentation." (Doc. 13.) The letter also stated that "the parties anticipate that they will be able to resolve the matter upon completion of the audit." (*Id*.) I again granted the parties' request and extended Respondent's time to respond to January 26, 2018. (Doc. 14.) Finally, on January 22, 2018, the parties submitted a third letter motion for an extension of time for Respondent to answer the Petition. (Doc. 15.) The letter stated "[a]s [Petitioners] previously informed this Court in their letter of December 18, 2018, [Respondent] has allowed [Petitioners] to conduct an audit of its books and records for the purpose of determining the amount of any delinquencies owed to [Petitioners]. [Petitioners'] auditors are in the process of finalizing the audit, and the parties anticipate reaching a settlement based on the audit amount." (Doc. 15.) I again granted the parties' request and extended Respondent's time to respond to March 15, 2018. (Doc. 16.)

On March 28, 2018, Respondents filed a Response to the Petition. (Doc. 18.) However,

because the response did not include an opposition to Petitioner's memorandum of law, I ordered Respondents to file an opposition memorandum by April 27, 2018. (Doc. 19.) On that date, Respondent complied with my order and filed a memorandum of law in opposition to the Petition, (Doc. 20), as well as the Lautner Declaration I, (Doc. 21), and the Greben Declaration I and accompanying exhibits, (Doc. 22). On May 18, 2018, Petitioners filed a reply memorandum of law, (Doc. 28), supported by the Ozard Declaration and accompanying exhibits (Doc. 27). Finally, on June 6, 2018, Respondent filed a sur-reply memorandum of law in opposition to Petitioner's reply memorandum, (Doc. 30), as well as the Lautner Declaration II, (Doc. 29), and the Greben Declaration II and an accompanying exhibit, (Doc. 31).[9]

In its sur-reply memorandum, Respondent represented that the "audit [was] underway but has not been completed." (Doc. 30, at 2.) Accordingly, on September 26, 2019, I ordered the parties to submit a joint letter providing an update as to the status of the audit and their respective positions as to how the revised audit would affect this proceeding. (Doc. 33.) I received the parties' joint letter on October 4, 2019, which demonstrated that Petitioners' revised audit report determined that Respondent's actual deficiency was $116,369.60, comprised of a principal deficiency of $73,840.72, interest of $23,314.16, an audit cost of $3,911.25, late payment interest of $535.32, and a delinquency penalty of 20%. (Doc. 37 Ex. A.) In light of the revised audit results, Petitioner represented that I should confirm its original petition, or in the alternative remand to the arbitrators for reconsideration. (Doc. 37, at 1–3.) Respondent represented that I should deny or modify the arbitration award in light of the revised audit, which revealed that the total arbitration award amounted to roughly twenty times Respondent's actual deficiency. (*Id.* at

---

[9] The parties continued corresponding throughout April and May of 2018 in an effort to gather all of the documents needed to perform the revised audit. (Ozard Decl., Ex. D; Greben Decl. II , Ex. A.)

8

3–4.)

On November 22, 2019, I held a status conference to discuss the parties' respective positions regarding the effect of the revised audit. At the conference, Petitioners agreed that the completed audit represented an accurate estimate of Respondent's liability in this case. Specifically, when asked whether the $116,369.60 figure was acceptable in light of the audit, Petitioners stated "Yes, correct." (Nov. 22, 2019 Tr. 5:14–16.) Petitioners further stated that the "Funds do not oppose settling in regard[] to or in terms to the recent audit." ( *Id.* at 4:22–23.) In light of these representations, I ordered the parties to meet and confer regarding the possibility of settlement, (Doc. 39), but on November 21, 2019 the parties informed me that they were unable to reach an agreement and referred me to their positions as outlined in the October 4, 2019 status update, (Doc. 40).

## II. <u>Legal Standard</u>

The Petition states that "[t]his is an action under section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132(a)(3); section 301 of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185; and/or section 9 of the Federal Arbitration Act, 9 U.S.C § 9, to confirm and enforce an arbitrator's Award rendered pursuant to" the parties' CBA. (Pet. ¶ 1.) However, "[b]ecause this dispute involves the assertion of rights under a collective bargaining agreement," the Court should only consider this petition pursuant to section 301 of the LMRA. *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 536 (2d Cir. 2016); *see also Coca–Cola Bottling Co. of N.Y. v. Soft Drink & Brewery Workers Union Loc. 812 Int'l Bhd. of Teamsters*, 242 F.3d 52, 54–55 (2d Cir. 2001) (holding that in cases brought under the LMRA, the FAA does not apply). Judicial review of an arbitration award under the LMRA is "very

9

limited." *Nat'l Football League Mgmt. Council*, 820 F.3d at 536 (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)). Courts are "not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement," and can "inquire only as to whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement." *Id*. "And '[u]nless the award is procured through fraud or dishonesty, a reviewing court is bound by the arbitrator's factual findings, interpretation of the contract[,] and suggested remedies." *Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Indus. Fund v. Port Parties, Ltd.*, No. 16 Civ. 4719 (KPF), 2017 WL 3267743, at *9 (S.D.N.Y. July 31, 2017) (alterations in original) (quoting *Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 124 (2d Cir. 1999)). "As long as the award draws its essence from the collective bargaining agreement and is not merely the arbitrator's own brand of industrial justice, it must be confirmed." *Nat'l Football League Mgmt. Council*, 820 F.3d at 537 (internal quotation marks omitted).

Although the FAA does not govern this petition, "federal courts have often looked to the [FAA] for guidance in labor arbitration cases." *1199/SEIU United Healthcare Workers E. v. S. Bronx Mental Health Council Inc.*, No. 13 Civ. 2608 (JGK), 2014 WL 840965, at *6 (S.D.N.Y. Mar. 4, 2014) (internal quotations omitted). Thus, "the body of law developed under Section 301 will at times draw upon provisions of the FAA, but by way of guidance alone." *Coca-Cola Bottling Co.*, 242 F.3d at 54 (2d Cir. 2001). In addition, section 301 of the LMRA "empowers the federal courts to fashion rules of federal common law to govern '[s]uits for violation of contracts between an employer and a labor organization' under the federal labor laws." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 n.9 (1987) (quoting *Textile*

10

*Workers v. Lincoln Mills*, 353 U.S. 448, 449–50(1957) (construing 29 U.S.C. § 185)); *see also Port Parties, Ltd.*, 2017 WL 3267743, at *10–11 (applying 9 U.S.C. § 10(a)(1)-(4) in a LMRA case); *1199/SEIU United Healthcare Workers E.*, 2014 WL 840965, at *6 (same).

### III. Discussion

Respondent argues that the arbitration award in this case evidences a material miscalculation, necessitating modification of the award or remand to the arbitrator. (Doc. 37, at 3.) Respondent further argues that because the final audit revealed an actual deficiency of just 5% of the total arbitration award, it would be unjust and absurd to enforce the award. (*Id.* at 4.) I agree.

Section 11 of the FAA provides that "[w]here there was an evident material miscalculation of figures," 9 U.S.C. § 11(a), an arbitration award may be modified or corrected "so as to effect the intent [of the award] and promote justice between the parties," *id.* § 11. Additionally, where there is "an evident material mistake" in an arbitration award, a district court retains "power under [section 11(a) of the FAA] to do equity and justice." *Transnitro, Inc. v. M/V Wave*, 943 F.2d 471, 474 (4th Cir. 1991); *see also Laurin Tankers Am., Inc. v. Stolt Tankers, Inc.*, 36 F. Supp. 2d 645, 652 (S.D.N.Y. 1999) (stating that "in proper circumstances, a reviewing court may look beyond 'the face of the award' to 'the arbitration proceeding' to 'do equity and justice'"). Courts have stated that "an ambiguity in the award for which the court may remand to the arbitrators may be shown not only from the face of the award but from an extraneous but objectively ascertainable fact." *Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 334 (3d Cir. 1991). "In those few instances where courts have modified arbitration awards under § 11(a), the errors have always been obvious, and the opposing parties generally have not challenged the miscalculations." *Companhia de Navegacao Maritima Netumar v. Armada*

*Parcel Serv., Ltd.*, No. 96 CIV. 6441 (PKL), 2000 WL 60200, at *7 (S.D.N.Y. Jan. 25, 2000) (collecting cases).

I find that the award at issue here suffers from an evident material miscalculation as it was based upon an estimated audit that was fatally flawed. Therefore, remand to the arbitrator is warranted. To estimate means "to judge tentatively or approximately the value, worth, or significance of" the thing being considered. *Estimate*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/estimate?src=search-dict-hed (last visited Feb. 18, 2020). Similarly, an estimate is "a rough or approximate calculation." (*Id.*) Although the final audit revealed an actual deficiency of $116,369.60, (Doc. 37 Ex. A), the figures relied on by the arbitrator in the "summary report" led to an estimated deficiency of $1,735,020.65. (Award, at 2.) The difference is striking, and it is clear that the estimated deficiency cannot be considered an approximation because it is roughly fifteen times the actual deficiency. Therefore, the award was obviously the result of a material and significant overestimation of Respondent's required fund remittances. Furthermore, Petitioners do not question the accuracy of the revised audit or the fact that the actual deficiency in this case is dwarfed by the estimated deficiency used by the arbitrator. Petitioners also represented in the parties' October 4, 2019 letter that a remand of this case to the arbitrator is an available course of action in light of the revised audit. (Doc. 37, at 3 n.1). Indeed, Petitioners represented earlier in this litigation in the tolling agreement that they would "agree to vacate the Arbitration Award" "[u]pon completion of the new audit to [their] satisfaction," but have not done so without explanation. (Pet. Ex. F, at 3.) Similarly, Petitioners represented on multiple occasions that the parties anticipated reaching a settlement based on the revised audit amount, (Docs. 11, 13, 15), and stated that the "Funds do not oppose settling in regard[] to or in terms to the recent audit," (Nov. 22, 2019 Tr. 4:22–23). Thus, remanding the

12

case to the arbitration panel will in part "effect the intent [of the award] and promote justice between the parties."  9 U.S.C. § 11.

Remanding this case to the arbitrator is not an unprecedented course of action.  In *Laurin Tankers*, the court remanded a case to the arbitrators for reconsideration where the arbitrators' original award rested on application of a "grossly excessive" damages offset figure.  36 F. Supp. 2d at 651–53.  The figure at issue—a charter vessel's daily fuel consumption rate—was material because the petitioner's award—damages associated with a cancelled trans-Atlantic freight charter—was offset by the cost of the charter's total fuel consumption.  *Id.* at 650–51.  The court determined that the award suffered from an evident material miscalculation because the fuel consumption figure applied by the arbitrators was completely unrealistic given the size of the vessel at issue, resulting in a vastly overstated damages offset.  *Id.*  ("Laurin states without contradiction that 'a consumption of 51.7MT/day is grossly excessive for a vessel of 19,957MT deadweight' . . . ; rather, so great a daily consumption is 'roughly equivalent to that of a 150,000MT deadweight vessel,' . . . It follows that calculating so large a daily amount of fuel oil consumption by so relatively small a vessel constitutes a 'miscalculation' which was or should have been 'evident' to anyone familiar with the industry, as these arbitrators surely were.").  Just as the arbitrators in *Laurin* relied on an incorrect average daily fuel consumption figure, the arbitrator in the instant case applied an overstated estimate of the average weekly hours subject to fund remittances when calculating Respondent's total deficiency.  This overstated estimate condemned the accuracy of the resulting award, which is completely erroneous in light of the revised audit.  Here, Respondent "states without contradiction that" the estimated deficiency underlying the Award is "grossly excessive," supporting the conclusion that the Award evidences a material miscalculation warranting remand.  *Id.*

Finally, remanding this case to the arbitration panel would not frustrate the LMRA's policy preferences. Although one of these preferences is "the private resolution of labor disputes without government intervention," the LMRA also embodies "a federal policy of promoting industrial stabilization through the collective bargaining agreement." *Nat'l Football League Mgmt. Council*, 820 F.3d at 536 (internal quotation marks omitted). Remanding this case merely promotes that stability by discouraging awards that parties agree are obviously erroneous in light of "objectively ascertainable fact[s]," such as the revised audit endorsed by the parties in this case. *Colonial Penn Ins. Co.*, 943 F.2d at 334.

IV. **Conclusion**

For the foregoing reasons, Petitioners' petition to confirm the arbitration award is DENIED. This case is remanded to the arbitrator for reconsideration in light of this opinion. SO ORDERED.

Dated: February 26, 2020
      New York, New York

Vernon S. Broderick
United States District Judge